**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**In re Huntington Bancshares**                   **Case No.  2:07–cv–1276**
**Incorporated Securities Litigation**

                                               **Judge Michael H. Watson**

## OPINION AND ORDER

This consolidated case[1] is putatively a shareholder securities class action,

brought under Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange

Act"), 15 U.S.C. §§ 78j(b), Rule 10b–5 promulgated by the Securities and Exchange

Commission ("SEC") and codified at 17 C.F.R. § 240.10b–5, and under Section 20(a) of

the Exchange Act, 15 U.S.C. § 78t.  The matter is currently before the Court on

Defendants' Motion to Dismiss the Consolidated Class Action Complaint (Doc. 38),

Lead Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss the

Consolidated Class Action Complaint (Doc. 40), and Defendants' Reply Memorandum

of Law in Support of Their Motion to Dismiss the Consolidated Class Action Complaint

(Doc. 43).

---

[1]  In a previous Order by the Court (2:07–cv–1276, Doc. 26), *Ellman v. Huntington Bancshares, Inc.*, Case No. 2:07–cv–1276, and *Rowe v. Huntington Bancshares, Inc.*, Case No. 2:08–cv–99, were consolidated into one action.  *In re Huntington Bancshares Securities Litigation*, Case No. 2:07–cv–1276 is the consolidated action.

For the following reasons, the Court **GRANTS** Defendants' Motion to Dismiss the Consolidated Class Action Complaint.

## I. BACKGROUND

This lawsuit was filed by purchasers of publicly traded Huntington securities on behalf of themselves and others similarly situated who purchased stock between July 19, 2007, and November 16, 2007 ("the proposed class period"). Plaintiffs claim Defendants issued materially false and misleading statements, public filings, press releases, and shareholder communications, among others, regarding Huntington's business and financial results. Specifically, Plaintiffs allege Huntington's acquisition of Sky Financial Group, Inc. ("Sky") subjected Huntington to more than $1.1 billion of subprime mortgage exposure due to Sky's long-term relationship with Franklin Credit Management Corporation ("Franklin"). Plaintiffs allege Huntington misled investors regarding its ability to weather the deteriorating real estate and subprime mortgage market.

In its June 24, 2008 Order (Doc. 28), the Court granted Operative Plasterers and Cement Masons and Hawaii Sheet Metal Workers (hereinafter collectively "Operative Plasterers Group" or "Plaintiffs") Lead Plaintiffs status. Subsequently, Plaintiffs filed a Consolidated Class Action Complaint (Doc. 32) ("Complaint") on August 22, 2008.

The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and the Exchange Act, 15 U.S.C. § 78aa. The Court has not ruled upon class certification.

### A. Parties

#### 1. Plaintiffs

Operative Plasterers and Cement Masons and Hawaii Sheet Metal Workers are

Lead Plaintiffs.  Plaintiffs brought this action on behalf of themselves and others similarly situated who purchased publicly traded Huntington securities during the proposed class period.

### 2. Defendants

Huntington Bancshares Incorporated ("Huntington") is a diversified financial holding company incorporated in Maryland and headquartered with its principal executive offices in Columbus, Ohio.  Huntington's stock trades on the NASDAQ under the stock symbol HBAN.

Huntington operates as the holding company for The Huntington National Bank, which provides retail and commercial banking and financial products and services in multiple states, including Ohio, Michigan, Pennsylvania, and Indiana, among others. Huntington provides full service consumer and commercial banking services, mortgage banking services, equipment leasing, automobile leasing, trust services, investment management, brokerage services, reinsurance of credit life and disability insurance, reinsurance of private mortgage insurance, retail and commercial insurance agency services, and other financial products and services.

Defendant Thomas Hoaglin was a director, Chairman of the Board, and Chief Executive Officer ("CEO") of Huntington.  Defendant Marty Adams was a director, President, and Chief Operating Officer ("COO") of Huntington.  Prior to the acquisition by Huntington, Defendant Adams was the CEO of Sky.  Defendant Donald Kimble was Executive Vice President, Finance Director, Chief Financial Officer ("CFO"), and Controller of Huntington.  Defendants Hoaglin, Adams, and Kimble are collectively referred to as the "Individual Defendants."  Huntington and the Individual Defendants

are collectively referred to as "Defendants."

## B. Factual Allegations[2]

Prior to its acquisition by Huntington, Sky was a publicly traded, Ohio-based financial holding company. Sky owned one commercial bank engaged in the commercial and consumer banking business with financial centers and automated teller machines in Ohio and parts of Pennsylvania, Indiana, Michigan, and Virginia.

Sky had a long-term relationship with its client, Franklin, a New Jersey based publicly traded company (NASDAQ: FCMC). Franklin's core business was the acquisition and servicing of, so called, scratch-and-dent first and second mortgages. Scratch-and-dent mortgages are loans generally outside the standard credit guidelines, and thus involve elevated risk due to document deficiencies, such as income documentation, limited or poor credit histories, or borrower defaults. Franklin also acquired and services subperforming, reperforming, and nonperforming residential mortgage loans. Franklin originated subprime mortgage loans, for both the portfolio and sale on the secondary mortgage market. Franklin has an origination arm, Tribeca Lending Corporation ("Tribeca"), a wholly owned subsidiary of Franklin, that originated subprime first mortgages. For seventeen years, Sky made loans to Franklin that Franklin used to finance its mortgages. In July 2007, Sky had $1.5 billion in exposure to Franklin.

In December 2006, Huntington and Sky announced the merger of the two companies. In July 2007, Huntington's $3.3 billion acquisition of Sky closed. Plaintiffs

---

[2] The following facts are taken from the Consolidated Class Action Complaint (Doc. 32).

allege Huntington obtained more than $1.5 billion in exposure to subprime mortgages because of the purchase.

On July 19, 2007, Huntington released second quarter 2007 financial results. Although earnings were down for that quarter compared to the second quarter of 2006, Plaintiffs allege Huntington stated it made necessary adjustments and remained confident the merger with Sky would positively impact its fourth quarter financial performance.

On October 18, 2007, Huntington released third quarter 2007 financial results. Plaintiffs allege Huntington assured investors it continued to project positive growth outlooks. On the October 18, 2007 Huntington third quarter 2007 earnings conference call, Huntington stated it was pleased with the third quarter 2007 results.

On November 16, 2007, Huntington alerted investors that Franklin recently announced the deterioration of its mortgage portfolio. As such, Huntington announced it expected its fourth quarter results would include an after-tax charge of up to $300 million, or $0.81 per common share, to replenish and build the allowance for loan and lease losses (hereinafter "ALLL"). Thus, Huntington stated it expected to report fourth quarter 2007 as a net loss. The information caused Huntington's stock to close on November 16, 2007, at $14.75 per share on volume over 10 million shares, down from $16.08 per share on volume over 3 million shares the previous day.

Plaintiffs allege that Huntington's acquisition of Sky subjected Huntington to significant subprime exposure because of Sky's relationship with Franklin. In the Complaint, Plaintiffs allege that during the proposed class period, Defendants engaged in a scheme to defraud the investing public regarding the intrinsic value of Huntington's

securities.  Plaintiffs allege Huntington continually issued false statements of material

fact assuring investors of its adequate preparations and defenses to the volatile

subprime market and concealed its growing exposure to the housing and credit crisis in

violation of the duties of full disclosure and the dissemination of truthful information.

Plaintiffs further allege the Individual Defendants were high-level executives and/or

directors who knowingly or recklessly disregarded that the information being

disseminated to the public was materially false and misleading.  Plaintiffs allege the

dissemination of such false information caused Huntington's stock to trade at artificially

inflated market prices, and, subsequent to the November 16, 2007, fourth quarter 2007

financial results, Huntington's shares sold in high volume causing the share price to fall.

In summary, Plaintiffs' Complaint alleges two counts:

(1) Count One alleges violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) ("Section 10(b)"), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"). Count One alleges Defendants schemed to deceive the investing public through the dissemination of untrue statements of material fact which artificially inflated and maintained the market prices of Huntington's stock causing Plaintiffs to purchase the Huntington securities at inflated prices, and;

(2) Count Two alleges violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)").  Count Two alleges the Individual Defendants as controlling persons of Huntington influenced and controlled the false content and the dissemination of such false content to the investing public and thus as a direct and proximate result of the Individual Defendants wrongful conduct, Plaintiffs suffered damages.  Claims under 20(a) are dependent on proof of liability under Section 10(b).  *See, e.g., Zaluski v. United American Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008).

*See* Compl. ¶ 140–155.

The Complaint also details the alleged false and misleading statements

disseminated by Huntington during the proposed class period, including excerpts of the

various statements.  Primarily, the Complaint focuses on four allegedly false sets of communications:

> (1) July 19, 2007:  Press release and conference call regarding Huntington's 2007 second quarter results;
>
> (2) August 17, 2007:  Huntington's "Third Quarter Analyst Handout" on Form 8–K filed with the SEC;
>
> (3) September 10, 2007: Analyst Presentation, and;
>
> (4) October 18 & 26, 2007: The October 18th press release and earnings call regarding Huntington's 2007 third quarter results, and the October 26th filing of the third quarter Form 10–Q filed with the SEC.

The Complaint further alleges that on November 16, 2007, Huntington issued its press release stating that because of the deterioration in Franklin's mortgage portfolios, it would be taking a 2007 fourth quarter after-tax charge of up to $300 million resulting in a 2007 fourth quarter net loss.

This lawsuit followed and was filed on December 19, 2007.

## II. STANDARD OF REVIEW

A claim survives a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the complaint's allegations are true."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (internal citations omitted).

A court must also "construe the complaint in the light most favorable to the

plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).  In doing so,

however, plaintiff must provide "more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555;

*see also Iqbal*, 129 S. Ct. at 1949 ("Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice."); *Ass'n of Cleveland*

*Fire Fighters v.City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007).

### III.  ANALYSIS

### A.  Section 10(b) and Rule 10b–5 Claims

Defendants allege the claims asserted under Section 10(b) of the Exchange Act

and Rule 10b–5 promulgated thereunder should be dismissed on the following grounds:

(1) Plaintiffs fail to allege particularized facts that Defendants made false and

misleading statements as required by the Private Securities Litigation Reform Act[3]

("PSLRA"), codified at 15 U.S.C. §§ 78u–4 & –5 (1995), 15 U.S.C. § 78u–4(b)(1);

---

[3]  Congress reformed the Exchange Act in 1995 with the PSLRA.  As explained by the Supreme Court in *Tellabs v. Makor Issues & Rights*, 551 U.S. 308, 313 (2007):

This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC). *See, e.g., Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345, 125 S. Ct. 1627, 161 L.Ed.2d 577 (2005); *J.I. Case Co. v. Borak*, 377 U.S. 426, 432, 84 S. Ct. 1555, 12 L.Ed.2d 423 (1964). Private securities fraud actions, however, if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81, 126 S. Ct. 1503, 164 L.Ed.2d 179 (2006). As a check against abusive litigation by private parties, Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA), 109 Stat. 737.

Exacting pleading requirements are among the control measures Congress included in the PSLRA. The Act requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.,* the defendant's intention "to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, and n. 12, 96 S. Ct. 1375, 47 L.Ed.2d 668 (1976); see 15 U.S.C. § 78u-4(b)(1), (2).

*Tellabs*, 551 U.S. at 313.

(2) Plaintiffs fail to allege Defendants possessed the appropriate degree of scienter as

Plaintiffs do not plead particular facts that give rise to the strong inference that

Defendants acted with the state of mind required by the PSLRA, 15 U.S.C. §

78u–4(b)(2), and; (3) Defendants' statements were forward looking and accompanied

by meaningful cautionary statements, therefore protected by the PSLRA's safe harbor

provision, 15 U.S.C. § 78u–5(c).

Section 10(b) provides, in relevant part, as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Rule 10b–5, promulgated under Section 10(b) by the SEC, provides, in relevant

part, as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Section 10(b) of the Exchange Act and Rule 10b–5 "prohibit 'fraudulent, material misstatements or omissions in connection with the sale or purchase of a security.'" *Frank v. Dana Corp.*, 547 F.3d 564, 569 (6th Cir. 2008) (citing *Morse v. McWhorter*, 290 F.3d 795, 798 (6th Cir. 2002)); s*ee also Tellabs*, 551 U.S. at 318.  Specifically, in order to state a private right of action under Section 10(b) or under SEC Rule 10b–5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Indiana State Dist. Council Of Laborers And Hod Carriers and Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942 (6th Cir. 2009) (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008)); *see generally Ley v. Visteon Corp.*, 543 F.3d 801, 806 (6th Cir. 2008).

In addition,

> under the PSLRA's heightened pleading requirements, any private securities complaint alleging that the defendant made a false or misleading statement must:

> > (1) . . . specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed [and]

> > (2) . . . state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

*Frank*, 547 F.3d at 570 (citing 15 U.S.C. § 78u–4(b)(1), (2))[4] (emphasis added by *Frank*

---

[4] In its entirety, 15 U.S.C. § 78u–4(b)(1), (2) reads as follows:

(b) Requirements for securities fraud actions

court).

As such, the PSLRA "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" Ley, 543 F.3d at 807 (citing Tellabs, 551 U.S. at 313 (additional citations omitted)).

### 1. Falsity

Defendants assert the Complaint should be dismissed because Plaintiffs do not sufficiently allege Defendants made any false statements or that Defendants' statements failed to incorporate all then-currently available information.  Defendants argue that Plaintiffs cannot simply point to the 2007 fourth quarter charge[5] and allege, in hindsight, that Huntington should have taken the charge earlier.  Defendants urge

---

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant–

    (A) made an untrue statement of a material fact; or

    (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

    the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(1), (2).

[5] The Court notes Huntington has not restated its third quarter 2007 financial statements.

that Plaintiffs' allegations are insufficient because they fail to demonstrate with sufficient particularity that Defendants' statements were false or misleading when made—i.e., "the reason or reasons why the statement[s are] misleading." *Tellabs*, 551 U.S. at 321. Defendants maintain Plaintiffs failed to allege that the four sets of communications were false. Instead, Defendants contend, the statements were true when made. Defendants state that the evidence offered by Plaintiffs in the form of confidential witnesses' statements regarding either Franklin or Sky or Huntington and the respective relationships does not lead to the conclusion that the four sets of communications were in any way false.

Generally, Plaintiffs allege that Huntington and Individual Defendants knew of the deteriorating condition of Franklin and thus its ability to continue to pay on its loan to Huntington, and Huntington and Individual Defendants issued false statements regarding Huntington's earnings statements, the adequacy of Huntington's loan loss reserves, and the relationship with Franklin. Specifically, Plaintiffs focus on four allegedly false sets of communications detailed in the Complaint. *See supra*, Section I(B). The Complaint further alleges that on November 16, 2007, Huntington issued its press release stating that because of the deterioration in Franklin's mortgage portfolios, it would be taking a 2007 fourth quarter after-tax charge of up to $300 million resulting in a 2007 fourth quarter net loss.

### (a) Adequacy of Reserves

Defendants cite to several cases from various circuits for the proposition that Plaintiffs cannot merely state that Huntington took a charge, and with hindsight, allege Huntington should have known to take it earlier thus rendering Huntington's statements

about its loan loss reserves false.

The Second Circuit addressed a similar situation in *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994). In *Shields*, a shareholder brought a securities action against a corporation and its executives alleging the misrepresentation of facts concerning, among other things, the corporation's loan loss reserves. *Id.* In affirming the district court's dismissal of the claims, the Second Circuit found that although the defendants' predictions regarding the adequacy of their reserves turned out to be mistaken, the plaintiff, with the benefit of hindsight, cannot merely allege the "defendants knew or recklessly disregarded the fact that the loan loss reserve was inadequate, or that continuing erosion of the real estate market would render the loan portfolio precarious, or that the outlook was poor" without alleging specific facts such as "the company's disclosures were incompatible with what the most current reserve reports showed at the time the disclosures were made." *Id.* The Second Circuit found the plaintiff's allegations to be "so broad and conclusory as to be meaningless," and "rejected the legitimacy of 'alleging fraud by hindsight.'" *Id.* (citations omitted).

Similarly, in *In re National Auto Credit, Inc. Sec. Litig.*, No. 1:98CV264, 1999 WL 33919791 (N.D. Ohio Oct. 12, 1999), the district court found that allegations of fraud by hindsight that a company's reserves were inadequate were not sufficient to survive a motion to dismiss. The district court held that the plaintiffs failed to cite facts to support an allegation that the defendant's reserves for credit losses were inadequate before the defendant announced that it was having financial problems, or, assuming that the defendant's credit reserves were inadequate as alleged, plaintiffs failed to cite facts sufficient to support an allegation that defendant knew or was reckless in not knowing

that National's credit reserves were inadequate. *Id.* at *17. *See also Zaluski*, 527 F.3d at 570, 576.

Finally, in *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000), the Second Circuit explained:

> [w]e have refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight.' Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.

216 F.3d at 309 (internal citations omitted). *See also Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 148 (D. Conn. 2007) (a plaintiff "must do more than allege that [a defendant] could not have actually believed that loan loss reserves were adequate because they later increased reserves"); *Johnson v. NYFIX, Inc.*, 399 F. Supp. 2d 105, 116 (D. Conn. 2005) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."); *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690–91 (S.D.N.Y. 2004) ("That defendants later decided to revise the amount of loan loss reserves that it deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time the registration statement and prospectus became effective.").

It is under this backdrop that the Court will review the sufficiency of Plaintiffs' pleadings.

### (b) Allegations Based on Confidential Witnesses

First, Defendants challenge the sufficiency of the Plaintiffs' allegations regarding

Huntington and Individual Defendants' knowledge of the true nature of Franklin's weakening state.  Huntington and Individual Defendants stated that, "[o]ur expectation is that the 2007 economic environment will continue to be negatively impacted by weakness in real estate markets . . . [but h]ow much these factors will affect banking activities and overall credit quality is unknown."  July 17, 2007 Press Release 12. Huntington and Individual Defendants repeatedly assured analysts and investors that it had adequate loan loss reserves, confidence in the financial benefits of the merger with Sky, and predicted earnings.

Plaintiffs challenge the aforementioned four sets of communications, contending that Defendants knew of or recklessly disregarded the fact that Franklin's condition was deteriorating and that Huntington's reserves were inadequate.  Plaintiffs attempt to show falsity by parading various confidential witnesses who attest to the long standing, intimate relationship of Sky with Franklin and to demonstrate that Huntington knew of Franklin's financial difficulties and therefore made false statements in regards to Huntington's earnings projections and adequacy of its loan loss reserves.

The parties do not dispute that "there is no requirement that [confidential witnesses] be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak*, 216 F.3d at 314. The Sixth Circuit, however, states that the who, what, when, where, and how a confidential witness knew of information should be definite, as allegations that are too vague and conclusory are not to be accorded much weight.  *Ley*, 543 F.3d at 811 (citing *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) (finding allegations

of confidential witnesses must be discounted and "[u]sually that discount will be steep")). "Therefore, when deciding whether to consider the statements attributed to confidential or anonymous witnesses in the Amended Complaint, as part of the calculus to be applied to determine whether the Plaintiffs have complied with the pleading requirements contained in the PSLRA, this Court will examine the descriptions of each of those individuals' jobs to ascertain whether any would have been in a position to have gained first hand knowledge of the facts attributed to him or her, and the detail of the information each is reported to have provided." *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 993 (S.D. Ohio 2008).

### (1) The Franklin Confidential Witnesses

Confidential witnesses ("CW" or "CWs") 6, 9–11, as numbered in the Complaint, are former employees of Franklin or Tribeca.

Plaintiffs assert CW 6 is a former legal assistant at Franklin in its Loss Mitigation Department. She was employed by Franklin for only three months, from March 2007 until June 2007, and notably she left Franklin prior to the proposed class period. CW 6 allegedly was "the first point of contact for agents and representatives of borrowers in default on their mortgages and who were in danger of foreclosure." Compl. ¶ 44 n.6. According to CW 6, a marked increase in the number of delinquent home loans began in April 2007. Specifically, CW 6 alleges that the number of new cases she received per day in April was double the number a month earlier, and, because of this, it was discussed at meetings that Franklin might expand its Loss Mitigation Department.

Plaintiffs assert CW 9 is a former president of Tribeca, Franklin's subsidiary, for nine months from February through November 2007. CW 9 alleged that Franklin

received $10 million per month in funding from Huntington which was used to acquire third party mortgage pools and fund Tribeca's originations of subprime loans. The funding from Huntington (or previously from Sky) streamed to Franklin as long as the mortgage pre-payments came in at a rate sufficient to meet Franklin's monthly debt service on the Huntington loans. CW 9 stated that in August 2007 Huntington reduced the $10 million monthly funding figure to Franklin because the mortgage pre-payments were not meeting the monthly debt service Franklin owed Huntington. Compl. ¶ 50

Plaintiffs assert CW 10 is a former Loss Mitigation Officer for Franklin employed from March 2006 through August 2007 when he was terminated. Plaintiffs state CW 10 corroborates CW 9's account of the events.

Plaintiffs assert CW 11 is a former Internal Auditor for Tribeca employed from "early 2007" until an unspecified date. Compl. ¶ 51 n.11. CW 11 asserts that Huntington reduced its funding to Franklin after the Sky acquisition which resulted in layoffs at Tribeca.

### (2) The Sky or Huntington Confidential Witnesses

The Complaint also features six confidential witnesses who are former Sky or Huntington employees (CWs 1–5, and CW 8).

Plaintiffs assert CW 1 is a former assistant vice president of the Specialty Lending Group[6] that worked for Sky, and then Huntington, in total for twenty-three years. Compl. ¶ 32. CW 1 spent 15 years working in Sky's Specialty Lending Group,

---

[6] The Speciality Lending Group allegedly was Sky's business group devoted entirely to the Franklin relationship. Compl. ¶ 32. According to CW 1, Sky's Specialty Lending Group was based out of Sky's Salineville, Ohio facility and was comprised of ten people who exclusively worked with the Franklin account. *Id.*

transitioned into a position with Huntington after the Sky merger, but left Huntington in December 2007. Compl. ¶ 32 n.1. CW 1 described the corporate ladder managing the Franklin relationship: Sky's relationship with Franklin was managed by Jerry Sutherin ("Sutherin"); Sutherin reported to Sky's Chief Credit Officer Frank Koch ("Koch"); Koch reported to Adams, then CEO of Sky. *Id.*

CW 1 described the "lock box" used to collect payments for the mortgages that Franklin used as collateral for its own loans from Sky. Compl. ¶ 33. After the merger, Huntington maintained this lock box. *Id.* CW 1 asserts that because of the lock box arrangement, real-time data on the timeliness of payments on the mortgages was collected and stored. *Id.* Similarly, CW 1 also described that Franklin's Accounting Department submitted a spreadsheet to the Specialty Lending Group containing data on payments, loan balances, interest, principal, and collections from Franklin's mortgages. Compl. ¶ 34. Originally the spreadsheet was submitted weekly, then in 2007, it was submitted on a monthly basis. *Id.* According to CW 1, the spreadsheet was openly available for review on Huntington's computer systems. *Id.*

Plaintiffs assert CW 2 is a former Senior Vice President of Funds Management who worked for Sky from 2000 through April 2007 and managed Sky's fixed income portfolio. Compl. ¶ 35 n.2. CW 2 states Adams and Koch were "actively involved in overseeing Sky's relationship with Franklin" and that Adams and Koch were both based in the Salineville, Ohio Sky branch. *Id.*

Plaintiffs assert CW 3 is the former President of Sky's Ohio Valley Region. Compl. ¶ 35. Prior to his tenure as President of Sky's Ohio Valley Region in February 2005, CW 3 was a Senior Regional Credit Officer in Sky's Commercial Lending Group.

*Id.* at n.3.  CW 3 remained as President of Sky's Ohio Valley Region and then at Huntington until June 2008.  *Id.*  CW 3 states that Adams was actively involved in the oversight of the Franklin relationship and that Adams fully grasped the total loan amount Sky lent to Franklin and Franklin's outstanding balances.  *Id.*  CW 3 also contends Adams had a friendship with Tom Axon, Franklin's Chairman.  *Id.*

Plaintiffs assert CW 4 is a former Regional Credit Officer for Sky from 1998 through 2005, and then President of one of Sky's nine regional divisions until July 2007.  Compl. ¶ 35 n.4.  In this position, CW 4 sat on two Sky committees: (1) the SkyFi committee, Sky's corporate loan review committee, and; (2) a regional loan review committee.  *Id.*  Sky's commercial loans to Franklin went before both of these committees for approval.  *Id.*  After the acquisition, CW 4 remained as Regional President with Huntington until Spring 2008.  *Id.*  Plaintiffs assert CW 4 corroborates CW 1, CW 2, and CW 3's statements that Koch oversaw Sky's relationship with Franklin and reported to Adams.  Compl. ¶ 35.

Plaintiffs assert CW 5 is a former Senior vice President of Finance and Controller at Sky who left Huntington the week following Sky's acquisition; no starting date is listed for CW 5.  Compl. ¶ 39 n.5.  CW 5 states between Fall 2006 and the July 2007 acquisition, information sharing between Sky and Franklin regarding Franklin occurred.  Compl. ¶ 39.  Specifically, CW 5 "personally collected certain financial information for Huntington's review in the due diligence process, including Sky's balance sheet, income statements, and general ledger."  *Id.*  CW 5 also contends Huntington requested and received information about the Franklin loans, including the account history and the underlying mortgage collateral.  *Id.*

### (3) Analysis

In this case, the Court finds Plaintiffs have failed to plead with particularity that Defendants' statements regarding the Huntington/Sky merger, the relationship with Franklin, the reserves, and the predicted earnings per share were *false when made*.

Plaintiffs satisfy the first prong of the PSLRA heightened pleading standard that a plaintiff must specify each allegedly misleading statement. Although Plaintiffs painstakingly detailed the July 19, 2007 press release and conference call regarding Huntington's 2007 second quarter results, the August 17, 2007 Huntington's Third Quarter Analyst Handout on Form 8-K filed with the SEC, the September 10, 2007 Analyst Presentation, and the October 18 & 26, 2007 press release, earnings call, and the Form 10–Q filed with the SEC, none of the evidence presented by the confidential witnesses, even if taken as true as required for purposes of ruling on a motion to dismiss, suggest that these representations were false.

For analysis purposes, the Court accepts the confidential witnesses' statements in full and without discount. *See contra Ley*, 543 F.3d at 811 (finding allegations of confidential witnesses in securities fraud cases must be discounted and "[u]sually that discount will be steep") (citations omitted)). Despite taking all the confidential witnesses statements as true, the Court finds Plaintiffs do not present reasons why the subject statements are misleading, nor do Plaintiffs explain why the statements were fraudulent. *See* 15 U.S.C. § 78u–4(b)(1); *Tellabs*, 551 U.S. at 320; *see generally PR Diamonds, Inc. v. Chandler*, 364 F.3d 671 (6th Cir. 2004).

Taken in their entirety or taken individually, the confidential witnesses affirm that there was a lengthy relationship between Sky and Franklin, significant managerial

oversight of this relationship existed (including oversight by Adams himself), the lock box system allowed for data on the collections of the mortgages, and that Huntington requested and received financial information during the due diligence period. Yet, none of the confidential witnesses stated he or she was aware that Franklin's reserves were inadequate, and none allege Huntington knew it either. None allege to know the components of Huntington's loan-loss reserve methodology or the inaccuracies of any such resulting reserve figure. None of the confidential witnesses allege they communicated *anything* to *anyone* at Huntington, Sky, or Franklin. None of the confidential witnesses allege the Individual Defendants committed fraud or disseminated false information. None of the confidential witnesses allege Individual Defendants had any information about Franklin that was not reflected in the reserves or earnings projections.

The Court agrees with Defendants that much of the confidential witnesses' statements are irrelevant in that they fail to explain why Defendants' statements were fraudulent. For example, although the Court accepts the confidential witnesses' statements in full, it finds that CW 6's statements about her heavier workload during her second month of employment being derived from an increase in delinquent home loans is conclusory at best. CW 6 worked at Franklin for a mere three months; her predictions as to why her workload increased are speculative and not demonstrative of Huntington's knowledge of the increase in Franklin's delinquent loans. Translating one legal assistant's workload into a demonstration of the falsity of public statements offered by top management of a major financial institution is a stretch of logic this Court is unwilling to accept.

It bears mention that Franklin was a client of Sky's that Huntington acquired, not a subsidiary, but a client. It bears further mention that Huntington was aware and publicly stated in its August handout that there was a "general slowdown in the housing market with home inventory at record levels" and "increasing delinquencies across the industry" and that "[b]ankruptcies and foreclosures have shown significant increases, particularly in the Midwest markets, though Huntington's performance is significantly better." *See* August Analyst Handout 37 (Defs.' Br. Ex. M).

CWs 9, 10, and 11, all employees of Tribeca or Franklin, stated Huntington reduced its funding to Franklin in August 2007,[7] a move Huntington's management stated it planned to make. *See* Sept. 10, 2007 Lehman Bros. Banking Conference Tr. ("[O]ver time, the absolute value of this exposure will be reduced. . . . [T]he current markets provide Franklin a great opportunity to acquire loans at very attractive discounts, but we are simply unable to support these types of volume.") (Defs.' Br. Ex. F). Yet none of these confidential witnesses allege Franklin, Tribeca, or Defendants knew the reserves were inadequate. None suggest Franklin was aware it would need to increase its reserves prior to Franklin's announcement in November 2007 that its reserves were inadequate. None suggest Franklin was behind or making partial payments on its loans to Huntington. None suggest they had conversations with any of Franklin's management about its reserves. None suggest Huntington had more information or different information than disclosed. None suggest any report or

---

[7]  The acquisition occurred in July 2007; it is unclear to the Court what entity provided loans to Franklin during this month. Was the "reduction" in August truly a reduction in loans or merely Huntington's anticipated level of participation in this relationship?

conversation occurred suggesting that the November 16 actions would be necessary.

It should be noted that Defendants dispute the level of knowledge these confidential witnesses even possessed or how such knowledge was obtained. Specifically, CW 9 worked for Tribeca, not Franklin, and the basis of CW 9's knowledge regarding the status of Franklin's commercial loans from Huntington is unclear. Plaintiffs do not allege CW 9 was responsible for Franklin's reserves or its commercial loans. *See In re Apple Computer, Inc., Sec. Litig.*, 243 F. Supp. 2d 1012, 1027 (N.D. Cal. 2002) (a job title is insufficient to provide an adequate basis for a confidential witness' knowledge, instead Plaintiff should describe how the confidential witness knew the alleged information).

Similarly, Defendants assert CWs 10 and 11 are low-level employees and Plaintiffs fail to allege how such employees obtained the knowledge that Huntington was reducing funding to Franklin. Plaintiffs counter that the witnesses statements corroborate each other thus presenting a "unified picture of Defendants' fraud." Pls.' Memo. in Opp. 14. In this regard, "a shared opinion among confidential witnesses does not necessarily indicate . . . falsity . . . if the allegations themselves are not specific enough," *In re Diebold Sec. Litig.*, No. 5:05CV2873, 2008 WL 3927467, at *6 (N.D. Ohio Aug. 22 2008) (citing *In re Metawave Communs. Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1070 (W.D. Wash. 2003) (citation omitted)), and the Court so finds. *See also, Cal. Pub. Emp. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004) ("The sheer volume of confidential sources cited cannot compensate for these inadequacies. . . . Cobbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA.").

The Huntington and Sky employees (CWs 1–5) describe the lock box method of receiving payment, the oversight of the Franklin relationship by Adams, and the collection of financial information for the due diligence review by Huntington. Plaintiffs, however, fail to explain how any of this information demonstrates the falsity of any particular public statement. Rather, the Court understands Plaintiffs' argument to imply that with access to such information Defendants should have known the reserves were inadequate which falls far short of demonstrating that Defendants knew the reserves were inadequate.

While ideally Huntington should have known better or should have known earlier, this information does not demonstrate that when the public statements were made, such statements were false. Huntington may have incorrectly believed it had adequate reserves, but the mere fact that those reserves eventually proved to be inadequate does not mean a false statement was made. *Zaluski*, 527 F.3d at 576. That Defendants "later decided to revise the amount of loan loss reserves that it deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time" of its public statements. *In re CIT Group*, 349 F. Supp. 2d at 690–91. "Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309 (internal citations omitted).

The Complaint is devoid of any allegation that Huntington or Sky had experienced a loss or a non-performing or delinquent loan to Franklin. The Complaint does not allege any specific facts that Huntington's disclosures were incompatible with

any reports, data, or signs that Franklin would be unable to pay its loans to Huntington, nor does the Complaint do anything more than allege Defendants should have known the continuing erosion of the real estate market would render the loan portfolio precarious.  Significantly, Huntington's public statements all address the faltering real estate market, the weakening market, increases in delinquencies in the industry, and the prospect of increases in allowance for loan and lease losses.  No information suggests Huntington knew of Franklin's situation prior to Franklin's own announcement that it was having problems.

*In toto* or individually, the statements attributed to the confidential witnesses taken as alleged by Plaintiffs and in the light most favorable to Plaintiffs, do not demonstrate reasons why Defendants statements were misleading, nor why the statements were fraudulent.  *See* 15 U.S.C. § 78u–4(b)(1); *Tellabs*, 551 U.S. at 319; *see also PR Diamonds,* 364 F.3d at 671.  In looking at "all of the facts alleged . . . including an evaluation, *inter alia*, of the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia," the Court finds the confidential witnesses' statements do not "provide an adequate basis for believing that [D]efendants' statements were false." *In re Cabletron Systems, Inc.*, 311 F.3d 11, 29–30 (1st Cir. 2002) (citing *Novak*, 216 F.3d at 314).  Accordingly, Plaintiffs fail to fulfill their pleading obligation under the PSLRA.

### (c) Statements Post-November 16

Defendants contend Plaintiffs attempt to show falsity based upon statements

made by Defendant Hoaglin during a November 16, 2007 conference call, a January 29, 2008 conference call, and a March 23, 2009 quote from *The Columbus Dispatch* newspaper.  Defendants claim the comments read in their entirety undermine any supposed "admission" by Defendant Hoaglin and that Plaintiffs attempt to "plead a false statement based on distortions of facts."  Defs.' Br. 12.

Plaintiffs allege post-November 16 statements by Hoaglin admitted Defendants disseminated false statements in October 2007.  Specifically, Plaintiffs point to several comments, including: (1) Hoaglin's "admission" during the November 16 conference call regarding deterioration in October of Franklin's portfolio (2) Hoaglin's "admission" during the January 29, 2008 Citigroup Financial Services conference that Huntington was aware that Franklin's business was weakening in July 2007; and (3) Hoaglin's comment in *The Columbus Dispatch* newspaper on March 23, 2009, "admitting" Huntington did not like Franklin's business as far back as 2006.  Compl. ¶¶ 92, 98, and 99.

When a court is presented with a Rule 12(b)(6) motion, in "addition to the allegations in the complaint, the court may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." *Ley*, 543 F.3d at 805 (*citing Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005) (citation omitted)).  As such, the Court has reviewed, *in toto*, the November 16 conference call, the January 29, 2008 Citigroup Financial Services conference transcript, and *The Columbus Dispatch* newspaper article.

When taken *in toto*, the Court finds the comments do not sufficiently plead falsity.  With regard to the November 16 conference call, Plaintiffs fail to capture the essence of the entire conversation.  While Hoaglin admits, "[w]e saw marked

deterioration during the month of October, and thus far to date in November, in

Franklin's portfolio," he also stresses Huntington only became aware of Franklin's

intention to delay filing a week prior.  Tim Barber, Huntington's Senior Vice

President–Credit Risk Management chimes in that, "we clearly saw a deterioration

recently . . . [but h]istorically and through to date, the cash flow has been positive. . . .

[I]t's been able to service the debt."  Defendant Hoaglin is not "admitting" that prior

statements were false, merely that events had recently changed Huntington's

perception of the Franklin relationship.  *See generally In re Ford Motor Co. Sec. Litig.,*

*Class Action*, 381 F.3d 563, 572 n.5 (6th Cir. 2004) (President of Ford's comments in

retrospect not demonstrative of the challenged statements falsity when made).

Similarly, throughout the proposed class period, Huntington repeatedly

discussed its plans to reduce the overall level of exposure to Franklin.  *See* Sept. 10,

2007 Handout and Oct. 18, 2007 Conference Call.  Defendant Hoaglin's post-

November 16 comments do not deviate from that.  Notably, in the January 29, 2008

conference, Defendant Hoaglin discussed Huntington's plan to reduce its exposure to

Franklin by

> using wholesale loan sales, if possible, just as we had reduced our
> automobile loan and lease exposure in 2003–2004 through loan sales.  At
> the time of our due diligence there was an active market for purchasing
> such loans.  We assumed that those markets would not materially change
> over this period and that we could execute this plan.  We were obviously
> very wrong.

January 29, 2008 Conference 1.  The fact that Huntington did not like Franklin's

business model and intended to "downsize the relationship, the exposure, as soon as

[it] got control," does not demonstrate whether Huntington knew its Franklin-related

reserves were insufficient.  Plaintiffs do not allege specific facts that Defendant Hoaglin

knew the statements were false *at the time they were made*.   Accordingly, Plaintiffs fail to sufficiently plead Defendants made any false statements during the proposed class period.

### (d) Conclusion

In considering the Complaint in its entirety and in considering all of the facts in a light most favorable to Plaintiffs, the Court **DISMISSES** Count One because Plaintiffs do not sufficiently allege Defendants made any false statements or that Defendants' statements failed to incorporate all then-currently available information.  Plaintiffs' Complaint instead sets out a "formulaic recitation of the elements" of a violation of Section 10(b) and Rule 10b–5 without alleging particularized facts as required by the PSLRA that plausibly demonstrate that Defendants made false and misleading statements.  *See Twombly*, 550 U.S. at 555.  Accordingly, Plaintiffs fail to meet the PSLRA's heightened pleading requirements.

### 2. Scienter

Although the Court dismisses Plaintiffs' claims because Plaintiffs fail to allege particularized facts that Defendants made false and misleading statements as required by the PSLRA, *see supra*, Section III(1)(c), the Court will analyze whether the Complaint establishes a strong inference of scienter as required by the PSLRA as an alternative basis for its ruling.

The parties dispute whether Plaintiffs adequately plead a "strong inference" of scienter as required under the PSLRA.  *See* 15 U.S.C. § 78u–4(b)(2).  Defendants argue the collective assessment of probative factors of scienter such as insider trading, divergence between internal and external reports, disregard of factual information, self-

interested motivation of defendants, and the lack of a restatement of the 2007 third

quarter financial statements, all support the conclusion that there is no inference, and

especially no strong inference, of Defendants' intention to defraud. Plaintiffs disagree

asserting that scienter is demonstrated by the facts regarding Defendants' close

oversight of the relationship with Franklin, the declining state of Franklin's portfolio,

reports particularizing Franklin's loans, and Defendants' alleged knowledge of Franklin's

substantial weakening. As discussed below, the Court finds Plaintiffs fail to plead a

strong inference of scienter.

### (a) Scienter Under the PSLRA

In order to avoid dismissal of its action, a plaintiff must plead facts giving rise to a

strong inference of scienter. "While pleading claims for fraud always required a higher

level of particularity, *see* Fed. R. Civ. P. 9(b),[8] the PSLRA requires an even higher

standard for pleading scienter in a securities-fraud case." *Ley*, 543 F.3d at 810. To

state a claim for private securities fraud, a "complaint shall, with respect to each act or

omission alleged to violate this chapter, *state with particularity facts giving rise to a*

*strong inference that the defendant acted with the required state of mind*." 15 U.S.C. §

78u–4(b)(2) (emphasis added). Thus, the PSLRA requires a plaintiff to state with

particularity the facts evidencing scienter. *Tellabs*, 551 U.S. at 314.

"Although the PSLRA does not define what constitutes the required state of

---

[8]  Fed R. Civ. P. 9(b) states:

In alleging fraud or mistake, a party must state with particularity the circumstances
constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a
person's mind may be alleged generally.

*Id.*

mind, we have explained that knowing and deliberate intent to manipulate, deceive, or

defraud, and recklessness may constitute scienter." *Ley*, 543 F.3d at 809 (citing *In re*

*Comshare*, 183 F.3d at 550 and *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, and

n.12 (1976)).   As the Sixth Circuit recently reiterated, scienter

> is limited to those highly unreasonable omissions or misrepresentations
> that involve not merely simple or even inexcusable negligence, but an
> extreme departure from the standards of ordinary care, and that present a
> danger of misleading buyers or sellers which is either known to the
> defendant or is so obvious that the defendant must have been aware of it.

*Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 917–18 (6th Cir. 2007) (citation

omitted).

The Supreme Court recently clarified the scienter standard during the pleading

stage for a claim under the PSLRA, holding that

> the inference of scienter must be more than merely "reasonable" or
> "permissible"—it must be cogent and compelling, thus strong in light of
> other explanations. A complaint will survive, we hold, only if a reasonable
> person would deem the inference of scienter cogent and at least as
> compelling as any opposing inference [of nonfraudulent intent] one could
> draw from the facts alleged.

*Tellabs*, 551 U.S. at 324.   The pertinent question "is whether *all* of the facts alleged,

taken collectively, give rise to a strong inference of scienter, not whether any individual

allegation, scrutinized in isolation, meets that standard." *Id*. at 322–23 (emphasis in

original).

The Sixth Circuit parsed out factors in *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th

Cir. 2001) (en banc) (recognized as overruled[9] in part on other grounds in *Frank*, 547

---

[9]   In *Frank*, the Sixth Circuit recognized that the pleading standard mandated by the Supreme
Court in *Tellabs* is whether a plaintiff has made allegations that support an inference of scienter that is "at
least as compelling" as competing nonculpable inferences.  In doing such, the Sixth Circuit recognized
that the previous pleading standard adopted in *Helwig* of "the most plausible of competing inferences" is
no longer good law after *Tellabs*.  *Frank*, 547 F.3d at 571.

F.3d at 571), that, while not exhaustive, are probative of scienter in a securities fraud case:

> (1) insider trading at a suspicious time or in an unusual amount;
>
> (2) divergence between internal reports and external statements on the same subject;
>
> (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
>
> (4) evidence of bribery by a top company official;
>
> (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
>
> (6) disregard of the most current factual information before making statements;
>
> (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
>
> (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and
>
> (9) the self–interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig*, 251 F.3d at 552; s*ee also Ley*, 543 F.3d at 810–15.

> As the Supreme Court explained:
>
> *First*, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.
>
> * * *
>
> *Second*, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to

---

In *Ley*, however, a post-*Tellabs* opinion, the Sixth Circuit continued to utilize the *Helwig* factors as probative of scienter in securities fraud cases.  *Ley*, 543 F.3d at 810–15.

dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.

\* \* \*

*Third*, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. . . . A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Tellabs*, 551 U.S. at 322–24; *see also Frank*, 547 F.3d at 570–71 (outlining three part *Tellabs* test and requiring that a plaintiff's allegations support an inference of scienter at least as compelling as competing nonculpable inferences).

### (b) Applying the Scienter Standard

Defendants assert the issue is "whether, considering the Complaint in its entirety, it is more plausible to infer that defendants knowingly misrepresented Huntington's Franklin exposure during the class period, only to reverse course a few months later, or that they acted honestly and simply did not predict the severity of the market deterioration and its effect on the Franklin portfolio." Defs.' Br. 14. Defendants maintain the evidence supports that the inference that Defendants acted appropriately on the information available at the time outweighs the inference of fraud.

Plaintiffs maintain that the Complaint in its entirety establishes that Defendants closely monitored the Franklin relationship and thus Huntington and Individual Defendants were aware of Franklin's weakening and deteriorating loan portfolios before and during the proposed class period. As such, Plaintiffs allege Defendants knowingly or recklessly made materially false and misleading statements.

Plaintiffs protest looking at the *Helwig* factors individually. The Court acknowledges that ultimately it must employ a "totality of circumstances" test in assessing whether a plaintiff has adequately alleged facts that collectively give rise to a strong inference of scienter and thus of at least recklessness. *See PR Diamonds*, 364 F.3d at 683. For clarity, however, the Court will individually address the *Helwig* factors. *See Ley*, 543 F.3d at 810 (analyzing the *Helwig* factors individually for clarity).

### (1) Insider trading at a suspicious time or in an unusual amount

Defendants assert the lack of stock sales by Individual Defendants weighs against any inference of scienter. Plaintiffs counter that the fact that none of the Individual Defendants participated in insider trading during the proposed class period does not dispose of a strong inference of scienter.

In *Tellabs*, the Supreme Court addressed a similar scenario. Despite the fact that the shareholders did not allege that any shares were sold during the class period, the Supreme Court found that "[w]hile it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference, . . . the absence of a motive allegation is not fatal. [A]llegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Tellabs*, 551 U.S. at 325. In considering the absence of insider sales, the Sixth Circuit has also explained that "the absence of stock sales by the Individual Defendants works against but does not conclusively defeat an inference of scienter." *PR Diamonds*, 364 F.3d at 691. The Court considers the absence of stock trades during the proposed class period under this framework.

In this case, Defendants provided Form 4's filed with the SEC as exhibits to their

Motion to Dismiss (Doc. 38, Ex. D).  "Because insider corporate executives must

document their stock transactions (on a Form 4, Statement of Changes in Beneficial

Ownership) and file the documents with the SEC, these documents are public records

that may appropriately be reviewed on a motion to dismiss." *In re Goodyear Tire &*

*Rubber Co. Derivative Litigation*, No. 5:03CV2180 *et al.*, 2007 WL 43557, at *8 n.8

(N.D. Ohio Jan. 5, 2007) (citing *In re Enron Corp. Securities, Derivative & ERISA*

*Litigation*, 258 F. Supp. 2d 576, 593 n. 12 (S.D. Tex. 2003)).  In reviewing the Form 4

Summaries provided by Defendants, the Court finds no shares were disposed of during

the proposed class period; conversely Adams, Kimble, and Hoaglin all *acquired* stock

during the proposed class period.  The absence of stock sales, and conversely, the

acquisition of stock, "works against but does not conclusively defeat an inference of

scienter." *PR Diamonds*, 364 F.3d at 691.  Yet this is just one piece of the analysis.

### (2) Divergence between internal reports and external statements on the same subject or Disregard of the most current factual information before making statements

The Court will analyze the second and sixth *Helwig* factor in conjunction, as they

are of similar substance.

Defendants assert that Plaintiffs do not allege, nor do Plaintiffs' confidential

witnesses allege, the existence of a single internal report that contradicts or undermines

Huntington's public statements.  Defendants allege that conversely the Complaint itself

acknowledges that Huntington's Senior Commercial Lender, Mike Cross, and

Huntington's Chief Risk Officer, Jim Nelson, "conducted multiple reviews of Franklin's

primary and secondary mortgage portfolios, including reviews of payment streams, after

the merger in July 2007."  Compl. ¶ 54.  Defendants contend that Plaintiffs and
Plaintiffs' confidential witnesses never allege that after these Huntington senior officers'
due diligence they knew, suggested, or reported that Huntington's or Franklin's reserves
were inadequate.  Defendants state Plaintiffs do not allege the senior officers' due
diligence produced any information inconsistent with Huntington's public statements.
Defendants suggest the intense and continuous oversight by Huntington regarding the
relationship with Franklin strongly suggests the public statements reflected the
information currently available at that time.

Plaintiffs counter that Huntington's due diligence period demonstrates Individual
Defendants' awareness and understanding of Franklin's suffering loan portfolios since
such information was critical to Huntington's core operations.   Plaintiffs cite to several
cases for the proposition that "[o]fficers of a company can be assumed to know of facts
'critical to a business's core operations or to an important transaction that would affect a
company's performance.'" *In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d
722, 727 (N.D. Ill. 2003); *contra see In re Federated Dept. Stores, Inc., Sec. Litig.*, 2004
WL 444559, at *6 (S.D.N.Y. 2004) (troubles with business constituting only ten percent
of total assets not a core operation and thus no strong inference of scienter).

For instance in *In re Sears*, the business operation under discussion was Sears'
credit card portfolio, which accounted for fifty-eight percent of Sears' operating income.
The district court found the Sears executives would know information surrounding this
area "clearly critical to Sears' 'core operations.'" 291 F. Supp. 2d at 727.  In the case at
bar, however, two notable distinctions stand out: (1) Huntington's executives were not
also the executives of Franklin, as Franklin was a recently acquired client of Huntington

and was itself a large, publicly traded company, and (2) Franklin's business was just 3.9

percent of Huntington's total loans and leases and just 2.8 percent of Huntington's total

assets, hardly bringing it into the territory of Huntington's core operations, despite that

such a small portion of Huntington's business could have such a large impact on its

bottom line.  *See* Defs.' Br. Ex. Q 32, 59.

> Furthermore, as the Sixth Circuit explained in a securities case,

> fraudulent intent cannot be inferred merely from the Individual
> Defendants' positions in the Company and alleged access to information.
> . . . [T]he Complaint must allege specific facts or circumstances
> suggestive of their knowledge. Without more, Plaintiffs fail to meet the
> PSLRA requirement to state with particularity facts giving rise to a strong
> inference of scienter. *See, e.g., In re Peritus Software Servs., Inc. Secs.
> Litig.*, 52 F. Supp. 2d 211, 228 (D. Mass. 1999) (general allegations that a
> defendant, through his board membership or executive position, had
> actual knowledge of false statements or reckless disregard for the truth
> are insufficient to raise strong inference of scienter). While it is true that
> high–level executives can be presumed to be aware of matters central to
> their business's operation, *In re Complete Management, Incorporated
> Securities Litigation*, 153 F. Supp. 2d 314, 325-36 (S.D.N.Y. 2001), in this
> case it cannot be said that the alleged misrepresentations or omissions
> pertained to central, day–to–day operational matters.

*PR Diamonds*, 364 F.3d at 688.

While Plaintiffs urge that the degree of due diligence conducted by Huntington

demonstrates its knowledge of Franklin's troubles, the Court finds this conclusion to be

little more than an assumption. "The inference that defendant acted with scienter need

not be irrefutable, *i.e.*, of the 'smoking-gun' genre," *Tellabs*, 551 U.S. at 324, but a

plaintiff must allege "specific facts or circumstances suggestive of [a defendant's]

knowledge." *PR Diamonds*, 364 F.3d at 688.  Here, Plaintiffs instead merely assert that

Individual Defendants admitted to monitoring the cash flow and being in touch with the

relationship and aware of the nature of Franklin's business, and surmise that

"Defendants *had to be aware* of the acute problems facing Franklin . . . ."  Pls.' Memo. in Opp. 27 (emphasis added); *but see PR Diamonds*, 364 F.3d at 688 ("fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information").  Courts have rejected such general allegations that the receipt of reports or the access to information establishes a strong inference of scienter.  *See, e.g., In re Ferro Corp.*, No. 1:04CV1440 *et al.*, 2007 WL 1691358, at *16 (N.D. Ohio June 11, 2007) ("[a]lthough the [complaint] refers repeatedly to certain "Monthly Reports," it is unclear exactly what was in the reports, exactly what statements were made on the same subject, and how the information in the external statements was different from the information in the internal reports"); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087–88 (9th Cir. 2002) (general allegations of negative internal reports do not establish scienter because plaintiffs "failed to cite to any specific report, to mention any dates or contents of reports, or to allege their sources of information about any reports").  For instance, courts have rejected complaints as insufficiently pleading scienter in which a plaintiff alleges that a defendant could track data contradicting forecasts, and then the plaintiff summarily makes allegations of what the plaintiff thinks that data would have shown.  *See Gruhn v. Tween Brands, Inc.*, No. 2:07–cv–852 *et al.*, 2009 WL 1542795, at *8 (S.D. Ohio June 2, 2009) (citing *In re Juniper Networks, Inc.*, 158 F. App'x 899, 900 (9th Cir. 2005) (additional citations omitted)).

"Congress did not merely require plaintiffs to 'provide a factual basis for [their] scienter allegations,' *i.e.*, to allege facts from which an inference of scienter rationally *could* be drawn.  Instead, Congress required plaintiffs to plead with particularity facts

that give rise to a 'strong'—*i.e.*, a powerful or cogent—inference." *Tellabs*, 551 U.S. at
323 (internal citations omitted).

The Court finds that generalized allegations of Individual Defendants' access to
documents and internal information lack specific facts to establish a strong inference of
scienter. Despite Individual Defendants' alleged access to spreadsheets on mortgages
or Huntington's lock box payment arrangement, Plaintiffs do not allege specific facts
suggestive of Individual Defendants' actual knowledge of any internal information that
contradicted Huntington's public statements.[10] *See In re Kindred Healthcare, Inc. Sec.
Litig.*, 299 F. Supp. 2d 724, 740 (W.D. Ky. 2004) (access to financial data through
sophisticated information technology does not permit an inference that defendants
knew that their reserves were insufficient); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp.
2d 1148, 1174 (C.D. Cal. 2007) (Allegations that the defendants had access to real time
reports allegedly showing Wet Seals' deteriorating financial condition are insufficient
because plaintiffs have not alleged any specific data that the individual defendants
learned from these reports that were inconsistent with Wet Seal's public statements.).

Plaintiffs claim Defendants had access to spreadsheets and data regarding the
mortgage lock box receipts but Plaintiffs never allege Defendants learned data from
these reports which were inconsistent with any of Huntington or Individual Defendants'

---

[10] Plaintiffs assert Hoaglin and Kimble ratified the statements in the public reports through each's
signing of the Sarbanes-Oxley certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002
thus showing evidence of scienter. Compl. ¶ 87. The Sixth Circuit, however, held a "Sarbanes-Oxley
certification is only probative of scienter if the person signing the certification was severely reckless in
certifying the accuracy of the financial statements." *Ley*, 543 F.3d at 812.
   Here, Plaintiffs fail to allege facts to suggest that Hoaglin or Kimble had reason to know or should
have suspected financial irregularities at the time they signed the certifications. Indeed, Plaintiffs have not
explained the link between these statements and any inference of scienter. Therefore, the signatures on
the Sarbanes-Oxley certifications are not probative of scienter.

public statements. Conversely, Franklin's loans remained current to Huntington both before and throughout the proposed class period suggesting the compelling inference that Defendant believed its reserves to be adequate. Plaintiffs point to no allegations that Defendants knew the reserves were inadequate, only that they should have known or must have known the reserves were inadequate. Without more, Plaintiffs allegations of divergence between internal reports and external statements or alleged disregard of the most current factual information before making statements are not demonstrative of scienter. This aspect of the analysis will be addressed as part of the totality of circumstances test in assessing whether Plaintiffs have adequately alleged facts that collectively give rise to a strong inference of scienter.

### (3) Closeness in Time

The third *Helwig* factor analyzes the closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information, here, between the alleged last misrepresentation on October 26, 2007, and the November 16 announcement. Defendants suggest the plain inference is that Huntington made immediate adjustments in November when it learned of Franklin's woes.

Plaintiffs urge the "most plausible inference is that Defendants knew the true facts long before disclosing them to the public, but that, upon Franklin's disclosure on November 15, 2007 that it would not be timely filing its quarterly reports with the SEC, Defendants could no longer hide Franklin's troubles, and the devastating impact on Huntington, from the market." Pls.' Memo. in Opp. at 29 n.18.

The Complaint also alleges scienter is demonstrated by Huntington's "failing to account for the risk associated with loans to Franklin by materially understating its ALLL

and its related provision for loan losses" in violation of GAAP.  Compl. ¶ 113; *see generally* Compl. ¶¶ 101–114.  Plaintiffs allege Defendants "knew" of the exposure because of "their close monitoring of Franklin's portfolio," and "turned a blind-eye toward the plethora of guidance . . . issued by U.S. governmental agencies about the importance of properly accounting for ALLL . . . ."  Compl. ¶ 110–11.  Again, according to Plaintiffs, scienter can be inferred because Defendants were knowledgeable about Franklin's portfolio and had access to information.

"The failure to follow GAAP is, by itself, insufficient to state a securities fraud claim."  *In re Comshare*, 183 F.3d at 553; *see also Zaluski*, 527 F.3d at 576.  And, several cases suggest that the temporal proximity between an alleged fraudulent statement and a later disclosure, without more, is nothing more than fraud by hindsight.  *See, e.g., Zaluski*, 527 F.3d at 576–77; *Patel v. Parnes*, No. CV 07–05364, 2008 WL 2803076, at *26 (C.D. Cal. May 19, 2008).

More importantly, however, Defendants stress Huntington has not restated its third quarter 2007 financial statements.  This lends credence that Huntington's reserves were properly recorded based on the then-available information.  Similarly, the auditors for Huntington have not retracted nor qualified any audit opinions.  *See, e.g., In re 2007 Novastar Financial, Inc., Sec. Litig.*, No. 07–0139–CV, 2008 WL 2354367, at *3 (W.D. Mo. June 4, 2008) (not finding a GAAP violation supported by the fact that "nobody—the SEC, Novastar's auditors, or anyone else—has suggested Novastar should or must restate its financial reports").

The generalized allegations of GAAP violations and any temporal proximity suggestive of scienter lack specific facts to establish a strong inference of scienter

especially considering that Individual Defendants were not management of Franklin as

it was a client of Huntington.  Viewing these facts in a light most favorable to the

Plaintiffs shows no restatement has been filed and thus, any temporal proximity

demonstrating scienter is nothing more than speculation.  Again, this is only one facet

of the analysis and will be considered as part of the totality of circumstances test in

assessing whether Plaintiffs have adequately alleged facts that collectively give rise to a

strong inference of scienter.

### (4)  The self-interested motivation of defendants in the form of saving their salaries or jobs.

As detailed in the Complaint, Plaintiffs allege that

> during the [proposed] Class Period, the Individual Defendants were
> motivated to misrepresent the Company's true financial condition so that
> they could substantially benefit from Company's merger with Sky.
> Specifically, Defendant Adams has an extraordinary financial interest in
> ensuring that the deal with Huntington closed and was deemed a success.
> Under the terms of the merger agreements, Adams was entitled to receive
> over $9 million if the deal closed, including $4 million to be paid in a lump
> sum within 30 days after the completion of the merger and an award of
> restricted stock with a fair market value equal to over $5 million.  In
> addition, Adams would gain a seat on Huntington's board of directors and
> would become Huntington's president and chief operating officer.  Then,
> no later than December 31, 2009, Adams was slated to receive a
> promotion by replacing Hoaglin as Huntington's CEO.

Compl. ¶ 122.  The Complaint is silent as to specifics regarding any self-interested

motivation Hoaglin or Kimble might have.  Plaintiffs' brief is bereft of any further

discussion of Individual Defendants' motives.

Defendants assert the Complaint fails to demonstrate any motivation by

Individual Defendants to misrepresent Huntington's financial conditions.  Specifically,

Defendants state that the circumstances surrounding Defendant Adams' employment

agreement negates the inference of scienter.  Defendants contend that Defendant

Adams' contract allocated a "lump sum cash amount" in the event of a merger. Defendants contend that instead of taking all of the compensation in cash, Defendant Adams took half of his compensation in Huntington stock demonstrating his personal investment in Huntington.

"While it is true that motive and opportunity are not substitutes for a showing of recklessness, they can be catalysts to fraud and so serve as external markers to the required state of mind." *Helwig*, 251 F.3d at 550. "[F]acts regarding motive and opportunity may be relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred, and may, on occasion, rise to the level of creating a strong inference of reckless or knowing conduct." *In re Comshare*, 183 F.3d at 551 (internal quotation and citation omitted). "While bare allegations of motive and opportunity, without more, are insufficient to establish scienter, the Court must assess whether such allegations, considered in conjunction with the remainder of Plaintiff's allegations, on the whole raise an inference of recklessness or knowing disregard." *PR Diamonds*, 364 F.3d at 690 (citation omitted).

As the court in *PR Diamonds* further explained,

> The more important question . . . is whether the Complaint alleges motives on the part of the Individual Defendants from which the Court could infer a knowing or reckless state of mind. In order to demonstrate motive, a plaintiff must show concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir.1999). . . . [C]ourts distinguish motives common to corporations and executives generally from motives to commit fraud. All corporate managers share a desire for their companies to appear successful. That desire does not comprise a motive for fraud.

*PR Diamonds*, 364 F.3d at 690.

In taking the facts most favorably to Plaintiffs, Individual Defendants had an

interest in having the Sky acquisition deemed successful and in receiving their salaries. Such motives are common to all executives. *See GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237–38 (3d Cir. 2004) ("In every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction, [but s]uch allegations alone cannot give rise to a "strong inference" of fraudulent intent.") Such desire alone does not comprise a motive for fraud. As to Kimble and Hoaglin, the Court finds Plaintiffs have not successfully alleged any inference of fraud. The Court, in construing the facts most favorably to Plaintiffs, will entertain an inference of motive in Adams' case when reviewing the factors collectively.

### (c) Conclusion

The Court has accepted all factual allegations in the Complaint as true. Furthermore, the Court has assessed the *Helwig* factors collectively. In considering the Complaint in its entirety and in considering all of the facts alleged collectively, the Court finds Plaintiffs fail to establish a strong inference of scienter. Viewed in their aggregate, Plaintiffs' allegations do not give rise to a "cogent" inference that Defendants possessed the requisite knowing or reckless intent to manipulate, deceive, or defraud. The allegations concerning Huntington's alleged knowledge after the due diligence period during the acquisition, the self-interested motives of Defendants, and the closeness in time of the supposed fraudulent statements and later disclosures, all lack the factual particularity that would support an inference of fraudulent intent that is "at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324.

"While the allegations no doubt merit drawing some inference of scienter, that is

not enough.  The PSLRA requires the Complaint to establish a strong inference [of scienter]."  *PR Diamonds*, 364 F.3d at 684.  The Complaint fails to meet this heightened burden.  Plaintiffs fail to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(1), (2).  Plaintiffs' Complaint sets out the "formulaic recitation of the elements" of a violation of Section 10(b) and Rule 10b–5 without alleging particularized facts as required by the PSLRA that plausibly demonstrate that Defendants knowingly or recklessly made false and misleading statements.  *See Twombly*, 550 U.S. at 555.  Accordingly, Plaintiffs fail to meet the pleading requirements of the PSLRA and Count One is alternatively **DISMISSED** for failure to state a claim of scienter as required under the PSLRA.

### 3.  Alleged Misstatements are Forward Looking Statements Protected by the Safe Harbor Provision of PSLRA or are Immaterial

Defendants argue that even if Plaintiffs adequately plead falsity and scienter, provisions of the PSLRA shielding Defendants from liability for forward-looking statements protect them from liability.  *See* 15 U.S.C. § 78u–5(c)(1)(A) ("safe harbor" for forward-looking statements). Because the Court concludes Plaintiffs' complaint does not adequately plead falsity nor scienter, the Court need not determine the independent argument that the challenged statements are forward-looking statements protected under the Reform Act's Safe Harbor provision.

## B. Control Person Claims Under Section 20(a)

Plaintiffs also allege that Individual Defendants are liable as controlling persons

of Huntington under Section 20(a) of the Securities and Exchange Act of 1934, which

provides:

> Every person who, directly or indirectly, controls any person liable under
> any provision of this title or of any rule or regulation thereunder shall also
> be liable jointly and severally with and to the same extent as such
> controlled person to any person to whom such controlled person is liable,
> unless the controlling person acted in good faith and did not directly or
> indirectly induce that act or acts causing the violation or cause of action.

15 U.S.C. § 78t(a).

For a Section 20(a) claim, Plaintiffs must establish that 1) "the 'controlled person'

must have committed an underlying violation of the securities laws or rules and

regulations promulgated thereunder"; and 2) "the 'controlling person' defendant in a

Section 20(a) claim must have directly or indirectly controlled the person liable for the

securities law violation." *PR Diamonds*, 364 F.3d at 696.

The Court also dismisses Count Two, Plaintiffs' Section 20(a) claim, against all

Individual Defendants because there is no predicate violation of Section 10(b), or Rule

10b–5 by any Individual Defendants. *See PR Diamonds*, 364 F.3d at 698 ("Because the

Complaint fails to state an underlying securities law violation by a controlled person, we

need not address the subsequent question of whether the Individual Defendants

possessed an adequate degree of control to support a Section 20(a) claim.").

### IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendants' Motion to

Dismiss (Doc. 38).  The Clerk is directed to enter **FINAL JUDGMENT** in this

consolidated matter in favor of Defendants and against Plaintiffs, dismissing all of

Plaintiffs' claims with prejudice.  This Opinion also disposes of the underlying case

consolidated with this case number, *Rowe v. Huntington Bancshares, Inc.*, Case No.

2:08–cv–99, and the Clerk is directed to **CLOSE** that case.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**